## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **BREAD FOR THE CITY**,<br>1640 Good Hope Road SE<br>Washington, DC 20020, | ) ) ) ) | |
| **DAMON SMITH**,<br>108 Fort Drive NE<br>Apt. 2<br>Washington, DC 20011, | ) ) ) ) ) | |
| and | ) ) | |
| **GENEVA TANN**,<br>3923 Clay Place NE<br>Washington, DC 20019, | ) ) ) ) ) | |
| *Plaintiffs,* | ) ) ) | |
| v. | ) ) ) | Civil Action No. 1:20-cv-127 |
| **UNITED STATES DEPARTMENT OF AGRICULTURE**,<br>1400 Independence Avenue, SW Washington, DC 20250, | ) ) ) ) ) ) | |
| and | ) ) | |
| **THE UNITED STATES OF AMERICA**,<br>U.S. Department of Justice<br>950 Pennsylvania Avenue, NW Washington, DC 20530, | ) ) ) ) ) ) | |
| *Defendants.* | ) ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs bring this action to challenge a U.S. Department of Agriculture ("USDA") Final Rule that would (by the agency's own estimate) terminate food stamp benefits for 688,000 low-income people nationwide.  Plaintiffs are organizations that provide food assistance and individual food stamp beneficiaries that will be directly, substantially and irreparably harmed if the Rule goes into effect.  They seek this Court's intervention to set aside the Rule, declare that the Rule is unlawful, and enjoin USDA from effectuating, implementing, or taking action under the Rule.

## JURISDICTION AND VENUE

1.      This action arises under a federal statute—the Food and Nutrition Act of 2008, 7 U.S.C. §§ 2011 *et seq.*  This Court has jurisdiction over this action under 28 U.S.C. § 1331, to provide remedies set forth in 5 U.S.C. § 706 and 28 U.S.C. § 2201.

2.      Venue is proper in this District under 28 U.S.C. § 1391(e).

## PARTIES

3.      Plaintiff Bread for the City ("Bread") is a 501(c)(3) nonprofit organization headquartered in the District of Columbia.  Started in 1974, Bread is an award-winning front-line agency serving Washington, D.C. residents experiencing poverty.  Bread's mission is to help these residents develop the power to determine the future of their community.  Bread operates two Centers in the District of Columbia and provides comprehensive direct services in an atmosphere of dignity and respect.  These services include food, clothing, medical care, legal services, and social services, reaching more than 31,000 individuals each year.  With the exception of the medical clinic, all of Bread's services are free.  In addition, Bread engages in community organizing and public advocacy.  Finally, Bread is dedicated to combatting racism, as structural racism is a major cause of poverty.

4.      Plaintiff Damon Smith (Smith) is a 45-year-old resident of the District of Columbia who receives benefits from the Supplemental Nutrition Assistance Program

5.      Plaintiff Geneva Tann (Tann) is a 28-year-old resident of the District of Columbia who receives benefits from the Supplemental Nutrition Assistance Program.

6.      Plaintiffs Smith and Tann are collectively referred to herein as "Individual Plaintiffs."  Bread and the Individual Plaintiffs are collectively referred to as Plaintiffs.

7.      Defendant United States Department of Agriculture ("USDA") is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 551(1).  It administers the Supplemental Nutrition Assistance Program ("SNAP") at issue in this case under the Food and Nutrition Act of 2008.

8.      Defendant United States of America is named as a defendant pursuant to 5 U.S.C. §§ 702-703, because this is an action for judicial review of actions of an agency of the United States that have affected Plaintiffs adversely.

9.      Individual Plaintiffs will suffer direct, concrete and substantial injury by the actions of the Defendants because the Final Rule eliminates their access to food and nutrition.  Bread will suffer direct, concrete and substantial injury by the actions of the Defendants because under the Final Rule it will be forced to divert scarce staff and resources away from its other time-sensitive client services and advocacy efforts in order to meet the heightened needs of its ABAWD clients who suddenly find themselves ineligible for SNAP benefits.  The relief requested in this case will remedy these harms by invalidating the Final Rule that is the source of the harms.

## STATUTORY AND REGULATORY BACKGROUND

10.     In 1964, Congress established the federally-funded, state-administered Food Stamp Program, to enable low-income beneficiaries to buy food that they otherwise would have to go without, thereby "safeguard[ing] the health and well-being of the Nation's population by raising levels of nutrition among low-income households." 7 U.S.C. § 2011; 7 C.F.R. § 271.1.

11.     Since its inception, the Program has helped fight food insecurity among low-income households, lifted millions of the individuals in these households above the poverty line and supported local economies.[1]   Effective October 1, 2008, the Program was renamed the Supplemental Nutrition Assistance ("SNAP") Program, and the federal Food Stamp Act was renamed the Food and Nutrition Act of 2008 ("SNAP Act").  Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, §§ 4001–02, 122 Stat. 1853 (2008).

12.     SNAP benefits can only be used to buy food and are paid directly from the State to the entity that sells the food to the beneficiary.  The federal government provides complete funding to States for all SNAP benefits and also covers at least 50% of a state's costs to administer the program.  7 U.S.C. §§ 2013(a), 2019, 2025(a); 7 C.F.R. §§ 277.1(b), 277.4.  Under the SNAP Act and regulations, the term "State" includes the District of Columbia.  7 U.S.C. § 2012(r); 7 C.F.R. § 271.2.

### 1996 Amendments To The SNAP Act

13.     In 1996, Congress amended the SNAP Act and among other things created new restrictions on the receipt of SNAP benefits by 18 to 49 year-old individuals who are not disabled and are not caring for a child.  This case focuses on those individuals, who are commonly referred to as "Able-Bodied Adults Without Dependents" or "ABAWDs."  The 1996 amendments provide that ABAWDs can only receive SNAP benefits for three months in a three-year period unless they are working or participating in education and training for 20 hours or more per week.  7 U.S.C. § 2015(o)(2); see also 7 C.F.R. § 273.24(b).

14.     Congress understood that it needed to blunt the harsh effects of this time limit on life-sustaining SNAP benefits when sufficient jobs were not available for ABAWDs, because their

---

[1] https://www.feedingamerica.org/take-action/advocate/federal-hunger-relief-programs/snap.

benefits would be terminated, through no fault of their own, even though they still needed food assistance.  During the congressional debate over the time limits, then-congressman and co-author of the provision, John Kasich, said that the time limit would only apply "if you are able-bodied, if you are childless, and if you live in an area where you are getting food stamps and *there are jobs available*."[2]  To ensure that the time limit would only apply if ABAWDs had meaningful job opportunities, Congress granted States (including the District of Columbia) broad authority to seek waivers from the time limit for "any group of individuals in the State" if the Secretary of Agriculture determines that the State has established that the "area in which the individuals reside (i) has an unemployment rate above 10 percent; or (ii) does not have a sufficient number of jobs to provide employment for the individuals."  7 U.S.C. § 2015(o)(4).

15.    Congress independently provided additional flexibility to States in the Balanced Budget Act of 1997 with the addition of an exemption to the time limit.  Pub. L. No. 105-33.  Specifically, this Act allowed States to extend benefits by one additional month for ABAWDs who do not reside in a waived area and would otherwise be ineligible for SNAP benefits due to the time limit.  7 U.S.C. § 2015(o)(6).  The exemption is available for up to 15 percent of the ABAWD population for that State or area. *Id.*  If a State did not use all of its allocated exemptions, it could carry over the remaining exemptions to the following year. 7 U.S.C. § 2015(o)(6)(G).

### USDA's Administration Of The Time-Limit Waiver Process From The Time Of The 1996 Statutory Amendments Through 2019

16.    From the time of the 1996 statutory amendments through 2018, USDA followed essentially the same process for administering time-limit waivers.  The agency originally began

---

[2] Cong. Record, 104th Congress, Welfare and Medicaid Reform Act of 1996 (House of Representatives – July 18, 1996), page H7905, https://www.congress.gov/crec/1996/07/18/CREC-1996-07-18.pdf (emphasis added).

operating under a 1996 guidance before it had the opportunity to promulgate new implementing regulations. The guidance noted that because the statute has two independent standards justifying a waiver—(1) an unemployment rate of over 10 percent or (2) a lack of sufficient jobs—"the statute recognizes that the unemployment rate alone is an imperfect measure of the employment prospects of individuals with little work history and diminished opportunities."[3]

17.     Addressing the statutory standard based on lack of sufficient jobs, the guidance provided a non-exhaustive list of the types and sources of data that a State could submit to support its waiver request, recognizing that "there are no standard data or methods to make the determination of the sufficiency of jobs" and that "the decision to approve waivers must be made on an area-by-area basis."[4] The non-exhaustive list covers (i) designation of the area "as a Labor Surplus Area by the Department of Labor's Employment and Training Administration (ETA);" (2) determination by the Department of Labor's Unemployment Insurance Service that the area qualifies for extended unemployment benefits; (3) proof that an area has a low and declining employment-to-population ratio; (4) proof that an area has a lack of jobs in declining occupations or industries; and (5) a 24 month average unemployment rate 20 percent above the national average for the same period. *See* 7 C.F.R. § 273.24(f)(2)(ii).

18.     The guidance also emphasized that States should be given "broad discretion" to "decide if a waiver request is appropriate" for the State or a part of the State, and to define "areas

---

[3] USDA, "Guidance for States Seeking Waivers for Food Stamp Limits," December 3, 1996, *available          at*                    https://fns-prod.azureedge.net/sites/default/files/resource-files/HistoricalPolicyDocument_GuidanceforStatesSeekingWaiversforFoodStampLimits_December1996.pdf.

[4] *Id.*

that best reflect the labor market prospects of program participants and State administrative needs."[5]

19.     USDA operated under the 1996 guidance until 2001, when it promulgated the regulations that are still in effect (and unchanged in pertinent part) as of the date of this Motion. The 2001 regulations codify the relevant parts of the 1996 guidance with respect to waivers based upon a lack of sufficient jobs.  A State can submit "whatever data it deems appropriate to support its request," with only the restriction that "States must submit [unemployment or labor force] data that relies on standard Bureau of Labor Statistics (BLS) data or methods" to support waiver requests based on one of these factors.  7 C.F.R. § 273.24(f)(2).  Like the 1996 guidance, the regulations set forth a  "non-exhaustive list" of types of information a State agency could submit to support a claim of "lack of sufficient jobs" for ABAWDs in a given area.  The regulations also note two categories of waivers that are "readily approvable." These "readily approvable" waivers cover (1) areas designated as a Labor Surplus Area (LSA); and (2) areas for which Bureau of Labor Statistics data show an unemployment rate 20 percent above the national average for any 24-month period no earlier than the period that the Department of Labor designates an LSA for the current fiscal year.  *See* 7 C.F.R. § 273.4(f)(3).  And the regulations  allow the States to define the areas to be covered by waivers, as long as States can provide data and analyses regarding the defined area.  7 C.F.R. § 273.24(f)(6).

### The Final Rule Challenged In This Case

20.     In December 2019, USDA issued the Final Rule challenged in this case, which will become effective on April 1, 2020, unless enjoined by this Court.  USDA intends, through the new regulation, to "ensure that waivers are applied on a more limited basis" by implementing "stricter

---

[5] *Id.*

criteria for waiver approvals." 84 Fed. Reg. 980, 981, 982 (proposed Feb. 1, 2019). It primarily

uses restrictions called "core standards" to achieve this objective. *See* 84 Fed. Reg. at 66,811 (Dec.

5, 2019) (to be codified at 7 C.F.R. 273.24(f)(2)). The core standards substantially displace case-

specific waiver determinations with a categorical prospective rule that prejudges waiver

applications and sharply restricts the evidence States can submit to justify them.

21. The core standards make the granting of waivers turn entirely upon unemployment

rates. Under the core standards, USDA will grant a waiver request if the area at issue has either

(1) a recent 12-month average employment rate over 10 percent; or (2) a 24-month average

unemployment rate that is 20 percent or more above the national unemployment rate but not less

than 6 percent. 84 Fed. Reg. at 66,811 (citing 7 C.F.R. § 273.24 (f)(2)). With very limited

exceptions, USDA will deny waiver requests that do not meet either of those two unemployment-

rate criteria. *See id.* (citing 7 C.F.R. § 273.24(f)(3), (f)(6)).

22. If the Final Rule goes into effect, it will (by USDA's own estimate) terminate the

SNAP benefits of "688,000 individuals (in FY2021)." 84 Fed. Reg. 66,782, 66,807 (Dec. 5, 2019).

That is because "approximately 77 percent of counties [will] los[e] their current time limit waiver"

and "88 percent of ABAWDs will live in . . . areas that are not covered by a waiver and thus face

the ABAWD time limit." *Id.*

23. Thousands of those individuals live in the District of Columbia. Although the

District currently has a waiver (as it has had every year since 1997), the waiver expires on March

31, 2020, one day before the Final Rule is scheduled to go into effect. As result, 80 to 90 percent

of the approximately 18,500 ABAWDs currently living in the District of Columbia will lose their

SNAP benefits if the Court does not enjoin the Final Rule.

## THE PARTIES' DISPUTE

### The Notice And Comment Process Leading To The Final Rule

24.     The Final Rule followed a February 2019 Proposed Rule that suggested substantially restricting ABAWD time-limit waivers (thereby significantly reducing the number of individuals who receive SNAP food assistance).  The overarching justification for the Proposed Rule was the agency's assertion that time-limit waivers allegedly are less necessary now than in the past.  According to USDA, the nation's currently-low overall unemployment rate shows that most ABAWDs have adequate job opportunities to work 20 hours per week, which the agency believes should allow ABAWDs to avoid triggering the time limit that would terminate their SNAP benefits.  84 Fed. Reg. 980, 981 (Feb. 1, 2019).

25.     The Proposed Rule generated more than 100,000 comments, the vast majority of which objected to the agency's proposal.  The objecting commenters included a broad range of stakeholders, including more than 20 States and territories and organizations like the Legal Aid Society of the District of Columbia and the Center for Budget and Policy Priorities.  Among other things, comments emphasized that a low overall unemployment rate does not measure job opportunities for ABAWDs, who typically are not average citizens and face substantial barriers to employment—such as low levels of education or prior histories of incarceration—that other citizens do not confront.  These comments argued that because ABAWDs have substantial difficulty seeking employment even in a time of low overall unemployment rates, limiting waivers as proposed would unfairly deny food assistance to people who desperately need assistance but cannot find jobs.

26.     In the Final Rule, USDA rejected most of these comments and made sweeping changes to the time-limit waiver process, materially altering the procedures and standards the agency has consistently followed for more than 20 years.  Some of the changes concern the means

for determining a lack of sufficient jobs and the criteria determining the areas to be covered by waivers. One significant change is new "core standards" that substantially displace the flexible, case-by-case determinations through which USDA has historically determined whether specific areas have a lack of sufficient jobs. Under the "core standards," waivers will (with limited exceptions) turn exclusively on an area's unemployment rate. 84 Fed. Reg. at 66,811 (citing 7 C.F.R. § 273.24 (f)(2) (2019)). This exclusive reliance on unemployment rates is an abrupt about-face from the agency's longstanding and consistent understanding that "unemployment rate alone is an imperfect measure of the employment prospects of individuals with little work history and diminished opportunities," that "there are no standard data or methods to make the determination of the sufficiency of jobs," and that "the decision to approve waivers must be made on an area-by-area basis."[6]

27.     The new regulation relies upon geographic areas defined by the U.S. Department of Labor as Labor Market Areas (LMAs) to address the territorial scope of waivers and related unemployment-rate data. If an LMA is within a single State, USDA bases the waiver determination upon unemployment-rate data from the LMA, and a waiver (if granted) is limited to the territory of the LMA. 84 Fed. Reg. at 66,811 (citing 7 C.F.R. § 273.24(f)(4)(i)).

28.     If the Final Rule goes into effect, the Individual Plaintiffs face the imminent threat of harm stemming from the loss of SNAP benefits and being faced with food insecurity. Bread will be forced to divert scarce staff and resources away from their other time-sensitive client

---

[6] USDA, "Guidance for States Seeking Waivers for Food Stamp Limits," December 3, 1996, *available        at*        https://fns-prod.azureedge.net/sites/default/files/resource-files/HistoricalPolicyDocument_GuidanceforStatesSeekingWaiversforFoodStampLimits_December1996.pdf (hereinafter the "1996 Guidance").

services and advocacy efforts to meet the heightened needs of their ABAWD clients, who will be ineligible for SNAP benefits.

### The Employment Opportunities And Job Training Programs For ABAWDS In The District Are Extremely Limited

29.     The District is encapsulated in a single LMA, which also includes *substantially larger* areas and populations outside the District: areas in Virginia (Arlington County, Clarke County, Culpeper County, Fairfax County, Fauquier County, Loudoun County, Prince William County, Rappahannock County, Spotsylvania County, Stafford County, Warren County, Alexandria City, Fairfax City, Falls Church City, Fredericksburg City, Manassas City, and Manassas Park City); Maryland (Calvert County, Charles County, Frederick County, Montgomery County, Prince George's County); and West Virginia (Jefferson County).

30.     On information and belief, because the vast majority of the LMA's territory is outside the District, about 90% of the LMA's labor force lives outside the District.  The District's civilian labor force was approximately 415,000 in November 2019 compared to approximately 3.08 million in the "suburban ring" comprising the remainder of the Metropolitan Statistical Area.[7] According to the District of Columbia Department of Employment Services (DOES), the November 2019 unemployment rate for the "suburban ring" of the Washington, DC Metropolitan Statistical Area was 2.5 percent while the whole MSA unemployment rate was only slightly higher at 2.8 percent.[8]  As a result, the unemployment rate for the LMA (which is the statistic pertinent to the waiver) is primarily derived from employment data outside the District.

---

[7] https://does.dc.gov/sites/default/files/dc/sites/does/publication/attachments/Nov_2019_DC_Area _Monthly.pdf.

[8] *See* https://does.dc.gov/sites/default/files/dc/sites/does/publication/attachments/Nov_2019_DC_Area _Monthly.pdf.

31.     On information and belief, a majority of jobs in the District require at least a bachelor degree, while most low-income District residents have a high school degree or less.

32.     On information and belief, the few jobs that are available to low-skilled workers provide low pay and unpredictable hours, making it difficult for ABAWDS to achieve the 20-hour work week requirement.

33.     On information and belief, more than half of SNAP households live in the District and that are majority African-American: Ward 5 (58% African-American), Ward 7 (92% African-American, and Ward 8 (92% African-American).

34.     On information and belief, ABAWDS in these Wards face particular challenges to finding employment within a feasible commuting distance.

35.     For the past several decades, unemployment rates among African American workers have been roughly double the unemployment rates for white workers with comparable education levels.[9]   On information and belief, African Americans traditionally face greater challenges in obtaining employment particularly where opportunities are scarce.

36.     On information and belief, job training opportunities in the District are too scarce to meet the needs of the estimated 13,050 ABAWDS that will lose benefits as a result of the Final Rule.

**Effect Of The Final Rule On The Plaintiffs**

**Plaintiff Damon Smith**

37.     Plaintiff Damon Smith is 45 years old and lives alone in subsidized housing in the District of Columbia and has no dependents.

---

[9] Unemployment Rates by age, sex, race, and Hispanic or Latino ethnicity," Bureau of Labor Statistics, revised January 4, 2019, https://www.bls.gov/web/empsit/cpsee_e16.htm.

38.     Mr. Smith receives food stamps in the amount of $194.00 a month.

39.     Mr. Smith has not qualified for and thus does not receive any disability benefits. He has applied for Supplemental Security Income at least twice, and both applications were denied.

40.     Mr. Smith currently has no regular employment and was last employed on a long-term basis in 2014 as a porter in a D.C. bakery.  To make ends meet, Mr. Smith earns some money by participating in a newspaper vendor program organized by a non-profit organization in the District of Columbia that publishes a biweekly newspaper providing in-depth coverage of homelessness and poverty, called Street Sense.  On days when his health and the weather permit, Mr. Smith sells the newspaper to passersby for a $2 donation for up to two to three hours at a time. This is not steady employment and he is not able to increase the length of time he sells the papers due to physical limitations.

41.     Mr. Smith has significant mobility issues.  Mr. Smith broke his left leg in 2006, experienced complications from surgery, and since that time, has suffered from serious stiffness and weakness in that leg.  To compensate, he overuses his right leg, causing significant damage that further impairs his ability to stand or walk at length.

42.     Mr. Smith has post-traumatic stress disorder, anxiety and bi-polar II disorder, which makes it difficult for him to maintain healthy interpersonal relationships with superiors and co-workers.  These mental health concerns have caused Mr. Smith to lose employment opportunities on multiple occasions.

43.     Mr. Smith is limited in his ability to get to and from a job, or take a job that requires him to drive, because he does not currently have a driver's license.  The DC Metro system does not reach every party of the city and surrounding area and does not operate 24 hours a day.  The

DC Metro system does not provide Mr. Smith transportation to all jobs in the District-Maryland-Virginia ("DMV") area.

44.     Mr. Smith's leg injury is aggravated by DC Metro system one-way commutes that last two hours or more.  Longer Metro rides can cost also as much as $6 one way, an amount that Mr. Smith cannot afford.

45.     Though Mr. Smith is not currently homeless, he has been homeless in the past and was nearly evicted in 2019 due to a financial mix-up with his landlord. Housing insecurity has detracted from Mr. Smith's ability to find employment.

46.     Mr. Smith is Black and does not have a college degree.

47.     Mr. Smith has, and, on information and belief, will continue to have difficulty finding sufficient employment.

48.     Mr. Smith has repeatedly been denied disability benefits and therefore must be sufficiently employed or in work training programs to qualify for SNAP benefits.

49.     Mr. Smith has tried unsuccessfully for many years to find steady employment.  Due to his personal circumstances—including physical limitations, mental health issues, transportation limitations, educational attainment, and race—Mr. Smith is prevented from finding steady employment.

50.     His lack of employment is chronic due to systemic factors at play in the District and his individual circumstances.

51.     On information and belief, Mr. Smith will not have sufficient access to a job training program if the Final Rule goes into effect.  Further, no job training program will provide him a college degree nor alleviate the personal circumstances that have prevented him from finding steady employment.

52.     Mr. Smith has experienced food insecurity.  When he was homeless, Mr. Smith's food stamps would often lapse due to difficulty completing the recertification process in time. Without food stamps he cannot guarantee he will be able to eat.  Mr. Smith relied on charity and soup kitchens for nutrition during these times.

53.     By April 2020, Mr. Smith will have received SNAP benefits for at least three (3) months within a three (3) year period.  Therefore, if the Final Rule goes into effect, in April 2020, Mr. Smith will lose his SNAP benefits and will not be eligible to receive SNAP benefits again until April 2023.

54.     If the Final Rule goes into effect, he will not know how he will eat.  When Mr. Smith does not know how he will eat, he experiences significant emotional distress.

**Plaintiff Geneva Tann**

55.     Plaintiff Geneva Tann is 28 years old and resides with her 95 year-old grandmother in the District of Columbia and has no dependents.

56.     Ms. Tann receives food stamps in the amount of $194 a month.

57.     Ms. Tann does not receive any disability benefits.

58.     She is currently unemployed and actively seeking employment.  Mr. Tann has been unable to find sustained and permanent employment.  In 2019, she was worked for a total of about five months through a temporary placement.  That job did not convert to a permanent position.

59.     Ms. Tann has anxiety, depression, and ADHD, which interfere with her motivation and ability to focus.

60.     Ms. Tann is limited in her ability to get to and from a job, or take a job that requires her to drive, because she does not own a car.  Therefore, Ms. Tann must focus her job search to

locations that are accessible by public transportation and during the hours that public transportation is available.

61.    Ms. Tann has also been unable to use the Metro in the past because she could not afford the fare.

62.    Ms. Tann has two criminal convictions stemming from a single incident involving an abusive ex-boyfriend in 2018.  At the time, Ms. Tann was in a relationship with the abuser.  Ms. Tann tried to leave a verbal confrontation initiated by her then-boyfriend, who then began punching her.  Police arrived during her attempt to leave, and in her panic and fear, she pushed an officer away in her attempt to escape. She pled guilty to two misdemeanors and is currently on probation.  The convictions impair her ability to secure employment, and the terms of probation impair her ability to meet expectations for employment within an office setting, as her court-mandated appointments occur during business hours.

63.    Ms. Tann is Black and does not have a college degree.

64.    Ms. Tann has, and, on information and belief, will continue to have difficulty finding sufficient employment.

65.    Ms. Tann has worked with a temporary placement agency, to no avail, finding that her mental health diagnoses, court-mandated mid-day appointments, and lack of personal transportation prevent her from obtaining and keeping steady employment.

66.    Her lack of employment is chronic due to systemic factors at play in the District and her individual circumstances.

67.    On information and belief, Ms. Tann will not have sufficient access to a job training program if the Final Rule goes into effect.  Further, no job training program will provide her a

college degree nor alleviate the personal circumstances that have prevented her from finding steady employment.

68.     By April 2020, Ms. Tann will have received SNAP benefits for at least three (3) months within a three (3) year period.  Therefore, if the Final Rule goes into effect, in April 2020, Ms. Tann will lose her SNAP benefits and will not be eligible to receive SNAP benefits again until April 2023.

69.     If the Final Rule goes into effect, Mr. Tann will not have consistent and steady access to food.

**Bread for the City**

70.     Every year, Bread's food program serves thousands of individuals and families living with low incomes in Washington, D.C.  Bread provides nutritious groceries to D.C. residents who generally have incomes of 200% or less of the federal poverty.  In the twelve-month period ending June 30, 2018, Bread's two food pantries provided groceries to more than 16,000 unique households.  Many of Bread's clients have received or currently receive SNAP benefits.

71.     If thousands of low-income D.C. residents to lose SNAP benefits, on information and belief, the number of D.C. residents facing food insecurity will substantially increase.  On information and belief, this will inflate demand for Bread's nutritional support program.  To compensate for increased demand, Bread expects that it will need to divert its scarce resources to ensure it is able to serve existing and new clients.

72.     Bread will also need to engage in new outreach efforts to educate District residents about the Rule and to mitigate any harm resulting from misunderstanding of or inability to comply with the Rule.  Bread expects that the necessary outreach will be costly and time-consuming to develop and implement.  In order to prepare for and conduct these new outreach efforts, Bread

expects that it will need to dedicate more staff time to conducting outreach within and outside of Bread.

73.     On information and belief, the Final Rule will make it more difficult for eligible District residents to apply for or maintain SNAP.  Bread anticipates that it will need to allocate more resources away from existing projects to the provision of legal and/or social services to address the new problems with SNAP benefits.

74.     Food insecurity is associated with other conditions of poverty, such as homelessness, job loss, and deterioration in mental and physical health.  Following removal of a critical support for thousands of low-income D.C. residents, on information and belief, demand for Bread's other services, including medical and social work, will increase.  Bread is already operating at the limits of its budget, and therefore is not institutionally equipped to meet this increase in demand.

75.     To address increased demand across its portfolio of services, Bread will be forced to divert human resources from its systemic advocacy and fundraising efforts.  Bread's ability to proactively advocate for policy changes that address the root causes of poverty will be limited and, instead, Bread will have to increase its efforts to alleviate the symptoms of poverty.

**COUNT I**
**Agency Action in Excess of Statutory**
**Jurisdiction, Authority, or Limitations, or Short of Statutory Right**

76.     Plaintiffs hereby incorporate by reference each and every allegation set forth in paragraphs 1 through 75 above.

77.     The Final Rule is a final agency action in excess of statutory jurisdiction, authority, or limitations, or short of statutory right within the meaning of 5 U.S.C. § 706(2)(C).

78.     The applicable statute (7 U.S.C. § 2015(o)(4)) establishes two independent standards governing whether a State may obtain a time-limit waiver for a specified area where

ABAWDs reside:  (1) an unemployment rate in the area of over 10 percent or (2) proof that the area "does not have a sufficient number of jobs to provide employment for" the ABAWDs.  A State may obtain a waiver by satisfying either standard.

79.     The statute defines "State" to include the District of Columbia.  7 U.S.C. § 2012(r).

80.     The first statutory standard is based solely on unemployment-rate information. Congress intended that a State could obtain a waiver under the second (independent) statutory standard based on proof that does not consist solely (or even partly) of unemployment-rate information.  Congress intended that a State could obtain a waiver under the second statutory standard through any type of credible proof that an area lacks "sufficient number of jobs" for ABAWDs.

81.     Congress intended that USDA would adjudicate States' waiver applications case-by-case, based upon specific information about particular areas where ABAWDs reside.

82.     Congress intended that USDA must determine waivers under the second statutory standard by engaging in a flexible determination of job sufficiency for ABAWDs, conducting a case-specific assessment of particular facts presented by the applicant State.

83.     The Final Rule exceeds USDA's statutory authority, because it substantially restricts waiver determinations that Congress intended and authorized under the second statutory standard.

84.     Among other things, the Final Rule exceeds USDA's statutory authority by strictly limiting waiver determinations under the second statutory standard to a consideration of unemployment rates, thereby precluding the agency from considering other probative evidence that an area lacks sufficient jobs.  USDA had no statutory authority to implement such a categorical unemployment-rate rule, which unlawfully displaces the flexible case-by-case adjudication, based

upon particular facts, that Congress intended USDA to conduct under the second statutory standard.

85.     By the terms of the applicable statute, waivers (1) are based upon "the request of a State agency . . . with the support of the chief executive officer of the State"; (2) apply to a "group of individuals in the State"; and (3) are based upon a determination about job-sufficiency in "the area in which the individuals reside."  7 U.S.C. § 2015(o)(4)(A).  Congress intended the "area in which the individuals reside" (in which job availability is determined) to be an area within the State applying for the waiver.  The Final Rule exceeds USDA's statutory authority by making some waivers—including those applied for by the District of Columbia—turn on job-sufficiency information from outside the State applying for the waiver.

86.     There is no adequate judicial remedy that is an alternative to the remedies requested in this Complaint.

87.     Under 5 U.S.C. § 706(2)(C), this Court should hold unlawful and set aside the Final Rule.

88.     Under 5 U.S.C. § 706(2)(C) and 28 U.S.C § 2201, this Court should declare the Final Rule unlawful.

89.     Under 5 U.S.C. § 706(2)(C), this Court should enjoin USDA from effectuating or implementing the Final Rule and from determining time-limit waivers under the Final Rule.

**COUNT II**
**Arbitrary and Capricious Agency Action**

90.     Plaintiffs hereby incorporate by reference each and every allegation set forth in paragraphs 1 through 89 above.

91.     The Final Rule is an arbitrary and capricious final agency action within the meaning of 5 U.S.C. § 706(2)(A).

92.     The Final Rule is arbitrary and capricious, among other things because there is a disconnect between the area covered by waivers and the areas where the job opportunities for ABAWDs are (which affect whether waivers will be granted).  For example, the Final Rule is arbitrary and capricious, because it bases waivers for the District of Columbia upon job opportunities that are primarily outside the District of Columbia.

93.     The Final Rule is arbitrary and capricious, among other things because USDA did not engage in reasoned consideration of public comments filed in the rulemaking proceeding for the Final Rule.  USDA's lack of reasoned consideration included conclusory responses to significant comments filed in the rulemaking proceeding.

94.     There is no adequate judicial remedy that is an alternative to the remedies requested in this Complaint.

95.     Under 5 U.S.C. § 706(2)(A), this Court should hold unlawful and set aside the Final Rule.

96.     Under 5 U.S.C. § 706(2)(A) and 28 U.S.C § 2201, this Court should declare the Final Rule unlawful.

97.     Under 5 U.S.C. § 706(2)(A), this Court should enjoin USDA from effectuating or implementing the Final Rule and from determining time-limit waivers under the Final Rule.

## COUNT III
### Agency Action Without Observance of Procedure Required by Law

98.     Plaintiffs hereby incorporate by reference each and every allegation set forth in paragraphs 1 through 97 above.

99.     The Final Rule is a final agency action without observance of procedure required by law within the meaning of 5 U.S.C. § 706(2)(D), because when USDA promulgated the Final Rule, it did not follow the notice-and-comment rulemaking requirements of 5 U.S.C. § 553.

100.    In promulgating the Final Rule, USDA violated the requirements of 5 U.S.C. § 553, among other things by failing to engage in reasoned consideration of public comments filed in the rulemaking proceeding for the Final Rule, including by giving conclusory responses to significant public comments.

101.    In promulgating the Final Rule, USDA violated the requirements of 5 U.S.C. § 553, because the Final Rule is not the logical outgrowth of the Proposed Rule that preceded it.  As a result, the public could not have reasonably anticipated changes between the Proposed and Final Rule, and the public lacked adequate notice that they should have filed comments on the provisions that were changed.

102.    Among other things, the Proposed Rule indicated that USDA would approve a waiver if the Labor Department's Unemployment Service determines that the applicant State qualifies for extended unemployment benefits.  The Final Rule deleted that basis for approval.  As a result, the public did not have reasonable prior notice that it should comment on the significance of such a determination as proof that an area lacks sufficient jobs.

103.    There is no adequate judicial remedy that is an alternative to the remedies requested in this Complaint.

104.    Under 5 U.S.C. § 706(2)(D), this Court should hold unlawful and set aside the Final Rule.

105.    Under 5 U.S.C. § 706(2)(D) and 28 U.S.C § 2201, this Court should declare the Final Rule unlawful.

106.    Under 5 U.S.C. § 706(2)(D), this Court should enjoin USDA from effectuating or implementing the Final Rule and from determining time-limit waivers under the Final Rule.

## **PRAYER FOR RELIEF**

Plaintiff respectfully requests the Court to grant the following relief:

21

I.   Set aside the Final Rule;

II.  Declare that the Final Rule is unlawful;

III. Enjoin USDA from effectuating or implementing the Final Rule and from

    determining time-limit waivers under the Final Rule;

IV.  Award attorney's fees and costs as allowed by law; and

V.   Award such other relief as this Court deems just and proper.


                                                Respectfully Submitted,


| | |
|---|---|
| _____/s/ Chinh Q. Le_____ | /s/ Daniel G. Jarcho___ |
| Chinh Q. Le (D.C. Bar #1007037) | Daniel G. Jarcho (D.C. Bar #391837) |
| Jennifer F. Mezey (D.C. Bar #462724)* | Kelley C. Barnaby (D.C. Bar #998757) |
| Nicole Dooley (D.C. Bar #1601371)* | Raechel J. Bimmerle* |
| LEGAL AID SOCIETY OF THE | Jean E. Richmann* |
| DISTRICT OF COLUMBIA | Hilla Shimshoni (D.C. Bar # 1033015)* |
| 1331 H Street, N.W., #350 | Kaelyne Y. Wietelman* |
| Washington, DC 20005 | ALSTON & BIRD LLP |
| Phone: (202) 661-5979 | 950 F Street, N.W. |
| Fax: (202) 727-2132 | Washington, DC  20004 |
| cle@legalaiddc.org | Phone: (202) 239-3300 |
| | Fax: (202) 239-3333 |
| | daniel.jarcho@alston.com |

                                                *Attorneys for Plaintiffs*


* Certification to practice pursuant to LCvR 83.2(g) submitted or to be submitted.